[No. 3238.]

Shorty Livingston v. The State.

Embezzlement—Ownership—Evidence—Fact Case.—See the statement of the case for evidence held insufficient to support a conviction for embezzlement, inasmuch as it does not establish the allegation of ownership.

Appeal from the District Court of Johnson. Tried below before the Hon. Jo. Abbott.

The conviction in this case was for the embezzlement of a finger ring, of the value of seventy-five dollars, the property of Doc. Martin, in Johnson county, Texas, on the twenty-eighth day of November, 1883.

J. H. Keith was the first witness introduced by the State. He testified, in substance, that he knew the defendant, whom he pointed out in court. In the latter part of the month of November, 1883, as well as the witness could remember, the defendant got up a raffle for a ring which he, defendant, held in his possession, but which the witness understood belonged to Mr. Seyfreidt. The ring was valued at seventy-five dollars. The defendant had a list of the names of the parties who took chances in the raffle, and opposite each name on the list was the number of the chance taken. The witness could not remember the number of the chances sold, but was of impression that they numbered thirty or forty, or more. The witness and Frank Hoffman were the judges of the raffle. It was made the duty of the judges to decide which of the numbers taken won the ring, and it was provided that the property, or the title to the ring, with its possession, should pass immediately upon the rendition of the decision. The ring was raffled in this manner: A circular piece of paste board was numbered with figures to correspond with the figures on the list. It was placed against a wall and fired at by a man agreed upon with a shot gun. It was agreed that the number nearest hit by a shot should win the ring. The gun being fired, the two numbers thirteen and seventeen were so near equi-distant from shot punctures that the judges were unable to decide between them until they procured an instrument and mea them, and decided in favor of number thirteen. On the

evening, and about an hour after the decision was rendered, the witness went to the defendant and asked him for the raffle list. Defendant told the witness that the list was at his house, but, being told that it was wanted, he said that he would bring it next morning. Witness told him that would not do—that he wanted it then. The defendant then said that he would go to his house and get it. Witness went with him to his house. Arrived at the house, the defendant said that his wife, to whom he had given it, was not at home. Witness then took a seat on the gallery, while defendant went off in search of his wife. Defendant found her about one hundred yards distant from his house, and the two came up to the house together, talking. The witness could not hear, but could see them talking. The three went into the house together.

After each had taken a seat, the defendant asked his wife for the paper with the names and numbers on it that had been put in the machine drawer. His wife said that she had thrown it into the fire, thinking it was of no value. On the way back to town, the witness told the defendant that he was satisfied that some rascality was being practiced about the ring. The defendant replied that number thirteen belonged to his wife; that she had a dream book, and that before the raffle she dreamed that number thirteen was going to win, and that he, defendant, and Mr. Seyfreidt took number thirteen between them; that, after that chance was taken by him and Seyfreidt, his wife got him to go and see Seyfreidt and ask him to surrender number thirteen to her, and that Seyfreidt did so. Witness took the defendant to Seyfreidt, who denied that he had ever had an interest in number thirteen. Witness heard no more of defendant's wife's claim to number thirteen, but afterward heard the defendant claim that number for himself. Martin also claimed number thirteen. Defendant left soon after the raffle, and returned in the custody of the sheriff. This took place in Johnson county, Texas.

Frank Huffman testified, for the State, that he and Keith were the judges of the raffle. The numbers thirteen and seventeen came so near a tie that he and Keith declined to decide without the use of an instrument. While the question of which number had won was being discussed on the field, some one proposed that the list of subscribers to chances should be brought, so that it might be ascertained who owned the contesting numbers. Witness protested against this, saying that he did not want to

know who the parties were until his decision was rendered. About this time, the defendant approached, looked over the witness's shoulder at the target, and whispered: "It is closest to number thirteen." Witness then took the target to one side, to get the sunlight on it, and the defendant again approached him and said in an undertone: "Number thirteen is mine." This was before the decision was given in favor of number thirteen. The witness afterward saw the list at the Paragon saloon. The witness then saw the defendant's name written in a place from which another name had evidently been erased.

Bob Stanley testified, for the State, that he remembered when the defendant was getting up the raffle. He, defendant, went to Doc Martin, and Martin agreed to take a chance in the ring. Martin kept a restaurant, and it was agreed between Martin and defendant that Martin's subscription price should go against a bill owed by defendant to Martin for meals.

Cal. Stanley testified, for the State, that he was present in the Pearl saloon on one occasion when defendant was trying to get up the raffle for the ring. Martin and defendant first discussed the raffle near the bar. This conversation witness did not hear. Afterward, while Martin was standing near the bar, and defendant in the back part of the saloon near the piano, Martin called out to defendant: "I will take number thirteen." Defendant, who had a paper in his hand, replied: "All right." Defendant wrote nothing on the paper at that time, but passed out of the saloon.

G. Allen was the next witness for the State. He testified that just after the raffle was over, the defendant came to his place of business asking about some oysters. Witness asked him how the raffle had passed off. Defendant said that thirteen was the winning number; that the party who subscribed for that number had not paid, and that he would take it. Defendant then rubbed something from a paper and wrote something on it. The State closed.

George Brown was the first witness who testified for the defense. Witness was a member of the firm of Brown & Wilson, hardware dealers. He had two chances in the raffle for the ring. After the shooting the defendant and the two judges, Messrs. Keith and Huffman, came into witness's store and asked for an instrument with which to measure the two contesting numbers. Witness then looked at the target and told the parties he thought that number thirteen had won. He then asked

the defendant to let him see the list of names. Defendant handed him the list without hesitation. The list contained some seventy-five names. One of the contesting numbers, with the subscriber's name, was lined out. It is a rule of raffle that when a subscriber has paid his subscription his number is marked "paid." Unpaid subscriptions are not marked at all. It is another rule of raffle that all numbers subscribed for and not paid when the raffle takes place, revert to the person who gets up the raffle or to the person who owns the property raffled for. The winning number in this instance, which was erased, was not marked paid. Other numbers not marked paid were also scratched or lined out on the paper when the witness saw it. Witness did not remember the name written to the winning number and scratched out.

Walter Christian testified, for the defense, that he owned number seventeen, the number in contest for the ring. He paid his subscription, but did not know whether or not his subscription on the list was marked paid. Defendant got up the raffle and had the ring when he got it up.

William Hodges testified that, on the morning after the raffle, the defendant came to him and told him that the raffle had occasioned much dissatisfaction; that, the witness being an old man, he, defendant, wanted the witness's advice; that he wanted nothing but what was fair; that he had won the ring, but was willing to give everybody another chance. Witness told him that his course was simple; that if he won the ring fairly, keep it; if he did not, give it to the man who did fairly win it. Defendant then said that by such a test he could only keep the ring. Defendant left on the train that night. Witness at that time was mayor of Cleburne.

John L. Maxey testified, for the defense, that he had a chance in the raffle for the ring. Number thirteen won the ring. After the raffle witness heard both Martin and defendant claiming the ring. Martin talked about taking the ring from defendant. Witness proposed to the defendant to give him, witness, the ring, promising to hold it for the party in whose favor the controversy was finally settled. Defendant did so. After the defendant left Cleburne, the witness delivered the ring to Tom Coulter, upon an order signed by Martin. Witness proposed to take and hold the ring subject to adjustment, as a friend to the defendant. He could not say that he and defendant were part-

ners at that time, but to some extent they were interested in the same business.

Tom J. Coulter testified that he was a deputy sheriff of Johnson county. Witness and sheriff Boyd took Martin under arrest to Dallas, on the evening that defendant left Cleburne, and traveled as far as Fort Worth on the same train with the defendant. Witness bought Martin's interest in the ring for twenty dollars. Witness had no change and told sheriff Boyd to pay Martin five dollars, and agreed to pay Martin's wife the balance. Witness also bought the defendant's interest for twenty-five dollars, five dollars to be paid in cash, and the balance to be applied to the payment of a fine due by defendant. Witness got an order from Martin for the ring, got the ring, and still retains it. Witness had never paid any one any amount on the ring, because when he got home he found Walter Christian setting up a claim to the ring. Witness afterwards received a note from Martin, in which he cancelled the trade. Martin was in arrest when the trade was made. He, Martin, said that he had been robbed; that he was taken from home and allowed no opportunity to get together any money; that he had to have money, and for that reason alone would sell the ring. Witness arrested the defendant in Texarkana. Defendant is a reputed gambler. Witness had never known him to follow any other occupation.

The material part of sheriff Boyd's testimony was that Coulter, *en route* to Dallas in charge of Martin, requested him, witness, to pay Martin five dollars, which witness agreed to do on reaching Dallas. He had no change when he reached Dallas, and did not fulfill his promise. He had never paid either Martin or his wife anything.

No brief for the appellant has reached the Reporters.

J. H. Burts, Assistant Attorney General, for the State.

White, Presiding Judge. We will not state in this opinion the evidence upon which this conviction was had, which will be sufficiently shown in the report of the case. It is not made to appear from the statement of facts that the ring appellant was convicted of embezzling was in fact the property of Martin, the alleged owner. It is, to say the least of it, doubtful if defendant's claim to it was not honestly and legally made. But,

whether this be so or not, it was incumbent upon the State to prove, as charged, that it was the property of Martin, and this the State has failed to establish with that reasonable degree of certainty that we are enabled to say that this most important fact is evident and made manifest by the record. Unless the property was Martin's, as is alleged, then there can be no doubt but that the entire prosecution must fail.

Because the evidence is insufficient, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 27, 1884.